**Reversed and Rendered and Opinion filed October 15, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00664-CV

---

### CITY OF HOUSTON, TEXAS, Appellant

### V.

### THE COMMONS AT LAKE HOUSTON, LTD., Appellee

---

**On Appeal from the County Civil Court at Law No. 1
Harris County, Texas
Trial Court Cause No. 1109638**

---

## OPINION

The Commons at Lake Houston, Ltd. sued the City of Houston for inverse condemnation and a declaratory judgment regarding a newly amended ordinance that regulates development in the 500-year floodplain. The City filed a plea to the jurisdiction, contending that The Commons' claims were not ripe. The trial court denied the plea. We reverse the trial court's order and render a judgment dismissing The Commons' claims without prejudice.

# I.    STANDARD OF REVIEW

Ripeness is a component of subject-matter jurisdiction, which may be challenged by a plea to the jurisdiction. *See Riner v. City of Hunters Creek*, 403 S.W.3d 919, 921–22 (Tex. App.—Houston [14th Dist.] 2013, no pet.). When a plea to the jurisdiction challenges the pleadings, we review de novo whether the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider the relevant evidence submitted by the parties. *Id.* at 227. If the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, then the trial court rules on the plea as a matter of law, *id.* at 228, and we review the ruling de novo, *see id.* at 226.

# II.    BACKGROUND[1]

The Commons owns a roughly 318-acre tract of land near Lake Houston. The Commons has begun development of the land into a master-planned community known as "The Crossing." Significant portions of The Crossing are located within the 100-year or 500-year floodplains.

The City has approved several general plans for The Crossing, and The Commons recorded subdivision plats consistent with the general plan and a final plat for part of The Crossing. The City approved a drainage plan and construction plans concerning water, sanitation, sewage, drainage facilities, and paving for part of The Crossing. The Commons began working on water, sewage, and drainage

---

[1] We look to the The Commons' live petition and the evidence submitted by the parties when reciting the relevant facts. Minor discrepancies between facts alleged in the petition and The Commons' evidence, such as the acreage of land and number of homesites at issue, are irrelevant to the disposition of this appeal.

lines, investing millions of dollars towards amenities for the development of The Crossing.

In the wake of Hurricane Harvey, the City passed Ordinance No. 2018-258 to amend the existing floodplain development ordinance in Chapter 19 of the City's Code of Ordinances. The old ordinance required that new residential structures within the 100-year floodplain had to be built at least one foot above the flood elevation. Among other changes, the new ordinance requires that new residential structures within the 500-year floodplain must be built at least two feet above the flood elevation. *See* Hous., Tex., Code of Ordinances §§ 19-2, 19-33, https://library.municode.com/tx/houston/codes/code_of_ordinances.

The Commons sued the City before the effective date of the ordinance and ultimately asserted claims for inverse condemnation and a declaratory judgment. The Commons alleged that the application of the amended ordinance to its property would substantially damage the market value of the property, and the current development plan would be unfeasible.

While the suit was pending, a person who worked on the The Crossing project for The Commons—Stephen Sheldon—emailed a managing engineer who worked for the City about what impact the "Vested Rights" statute[2] might have if a general plan had been filed for a master-planned subdivision. In the email, Sheldon wrote, "I'm hoping you might be able to answer a question related to the ordinance that I'm having trouble tracking down." Sheldon concluded:

> I realize you aren't an attorney, but I was hoping either this had come up already in internal discussions (in which case you might know the answer as to whether [the statute] applies) or you might be able to forward this e-mail to an attorney who worked on this ordinance, who

---

[2] *See* Tex. Loc. Gov't Code ch. 245.

might have this answer. Trying to do some advance planning for a couple of large tracts, and want to make sure I plan correctly!

Sheldon did not mention The Commons, The Crossing, or any details related to The Crossing.

> The City's engineer responded in relevant part:

> You are right, I'm not an attorney. What I can tell you is that while the plat would in fact be grandfathered and would not have to be re-platted due to the ordinance change, the particulars of the improvements (requirements for elevation of structures and mitigation requirements) are not part of the plat. The required elevation of structures and grading plans including required floodplain storage mitigation can only be grandfathered if that particular scope of work is part of the plans submitted for permit by the effective date of the ordinance (September 1, 2018).

> I hope this helps you. If not, let me know and I will get you more information.

Sheldon responded, "I think so. . . really appreciate the thoughts, and needless to say, good luck with all the fun stuff coming your way with this new ordinance! ☺" (ellipsis in original).

The City filed a plea to the jurisdiction, contending that The Commons' claims were not ripe because the City had not had an opportunity to make a final decision applying its floodplain regulations to The Crossing. The Commons responded with various items of evidence, including the emails discussed above and an affidavit from an employee of an entity related to The Commons. The employee testified that The Commons "conducted an analysis" and determined that the development of The Crossing would be "financially infeasible" under the amended ordinance. He testified that nearly 70% of the lots would be "unsaleable."

4

The City filed an affidavit from the engineer who had answered the email. She testified that her email was not a final decision by the City approving or denying a permit, nor was her response a denial of a variance under the ordinance.

The trial court denied the plea, and the City appealed. The ordinance became effective during the pendency of this appeal.

### III.  ANALYSIS

In a single issue, the City contends that the trial court erred by denying the plea to the jurisdiction because The Commons' claims are not ripe. Specifically, the City contends that the City has not made any final decision applying the ordinance to deny any permit application for The Commons' property or otherwise decided whether the former or amended ordinance applies to The Crossing.

### A.  Legal Principles for Inverse Condemnation and Chapter 245 Claims

When the government's regulation of private property reaches a certain magnitude, there must be an exercise of eminent domain and compensation to the landowner. *City of Houston v. Carlson*, 451 S.W.3d 828, 831 (Tex. 2014). If a landowner believes compensation is due to them for a regulatory taking, the landowner may bring a claim for inverse condemnation. *Id.* A regulatory taking can occur if a government agency imposes restrictions that unreasonably interfere with a landowner's rights to use and enjoy the property. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex. 1998).

Chapter 245 of the Local Government Code creates a system by which property developers can rely on a municipality's land-use regulations in effect at the time the original application for a permit had been filed. *Vill. of Tiki Island v. Premier Tierra Holdings, Inc. (Tiki Island I)*, 464 S.W.3d 435, 439 (Tex. App.— Houston [14th Dist.] 2015, no pet.). Generally, Section 245.002 establishes that

municipal regulatory agencies must consider a permit application under the terms of the ordinances that were in effect at the time a permit, development plan, or plat application was filed. *Id.* at 440 (citing Tex. Loc. Gov't Code § 245.002(a)). The rights accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought. *Id.*

These statutory rights are commonly referred to as "vested rights." *Id.* Vested rights attach to a project, not to a particular landowner. *Id.* Thus, Chapter 245 "freezes" the rules at the time the original application for a permit is filed and limits the rights of a municipality to change the rules in the middle of the game. *Id.* Chapter 245 authorizes enforcement of its provisions through a request for declaratory relief. *Id.* (citing Tex. Loc. Gov't Code § 245.006(a)).

## B.    Legal Principles for Ripeness Doctrine

Justiciability doctrines, such as ripeness, are rooted in the prohibition against advisory opinions. *Id.* at 439; *see also Perry v. Del Rio*, 66 S.W.3d 239, 249 (Tex. 2001). Ripeness is a question of timing. *Perry*, 66 S.W.3d at 249. It is invoked to determine whether a dispute has matured to the point that warrants a decision. *Id.* The central concern is whether the case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all. *Id.*

Ripeness requires a concrete injury. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000). A case is not ripe if determining whether the plaintiff has a concrete injury depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *Id.* at 852. The facts must be sufficiently developed so that an injury has occurred or is imminent. *See id.* at 851–52. A case that was unripe when initially filed can be become ripe by subsequent events. *See Perry*, 66 S.W.3d at 251–52.

6

**C.  Ripeness Doctrine Applied to Regulatory Taking and Chapter 245 Claims**

A court cannot determine if a regulation has gone "too far" unless it knows how far the regulation goes. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 929 (Tex. 1998). In other words, a court cannot determine whether a taking has occurred until the court can compare the uses prohibited by the regulation to any permissible uses that may be made of the affected property. *Id.* Accordingly, for a regulatory taking claim to be ripe, there must be a "final decision regarding the application of the regulations to the property at issue." *Id.*

A final decision usually requires both a rejected development plan and the denial of a variance from the controlling regulations. *Id.* The variance requirement is applied flexibly to serve its purpose of giving the government an opportunity to grant different forms of relief or make policy decisions which might abate the alleged taking. *Id.* at 930. Thus, a landowner is not required to make futile variance requests or permit applications. *See id.* at 929. The ripeness doctrine does not require a landowner to seek permits for development that the landowner does not deem economically viable or to make development proposals that the landowner would never actually develop. *Id.* at 932 (holding that the landowner who had requested development of 3,600 units was not required to make a subsequent request for a variance to develop 3,600 units when the town "clearly" was not going to approve a development proposal for 3,600 units).

Furthermore, a taking claim may be ripe regardless of whether a party has had a development plan rejected and a variance denied if (1) a party has alleged or demonstrated a concrete injury and (2) the regulation does not allow for the exercise of discretion or the application of a variance. *See City of Houston v. HS Tejas, Ltd.*, No. 01-11-00431-CV, 2012 WL 682298, at *4 (Tex. App.—Houston

7

[1st Dist.] Mar. 1, 2012, no pet.) (mem. op.); *City of Houston v. Norcini*, 317 S.W.3d 287, 293–95 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001) ("While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a taking claim is likely to have ripened.").

This court has held that for a declaratory judgment claim under Chapter 245 to be ripe, the plaintiff must allege or demonstrate that an "official action" of the government has caused the injuries. *See Tiki Island I*, 464 S.W.3d at 442. This court held that a claim was not ripe when the plaintiff filed a plat application and the municipality denied it, but (1) the record did not disclose the reasons why the municipality denied the application; (2) the plaintiff never asked the municipality to certify the reasons for the denial; (3) no plat or permit applications had since been denied for any specified reason; and (4) the plaintiff had not challenged the denial of the plat application in any proceeding. *Id.* A plaintiff may have vested rights in a project, but there must be some context within which to declare what the rights are. *See id.* at 443.

Similarly, the Third Court of Appeals has held that, because of the statute's focus on zoning rights, a plaintiff "must allege some facts to show that the city has applied its regulations to a particular case." *Save Our Springs All. v. City of Austin*, 149 S.W.3d 674, 683–84 (Tex. App.—Austin 2004, no pet.). "A regulatory agency ought to have the opportunity to make a final determination as to which set of land-use regulations apply to a specific plat before a court intervenes." *Id.* at 684.

**D.     Unripe Inverse Condemnation Claim**

It is undisputed that The Commons has not had any permit or plat applications, or requests for variances, denied as a result of the amended ordinance. Indeed, the ordinance did not become effective until after the trial court denied the plea.

The Commons contends that its inverse condemnation claim was "ripe upon enactment" because the ordinance prohibits precisely the use intended for the property.[3] The Commons contends further that the futility exception applies for two reasons. First, The Commons contends that its financial hardship alone cannot justify a variance under the ordinance. Second, The Commons contends that it cannot comply with particular requirements for the application for a floodplain development permit because it is a developer and not a builder.

The ordinance expressly allows for variances. *See* Hous., Tex., Code of Ordinances § 19-20. Thus, the ordinance is not like the one faced in *Norcini*, *HS Tejas*, and similar cases. The ordinance in those cases prohibited construction in the floodway and left no room for discretion by the City. *See, e.g.*, *Norcini*, 317 S.W.3d at 295. Accordingly, those cases are inapplicable to the facts here.

The ordinance provides that "a variance may be sought only on the basis that the imposition of the requirements of this chapter for the issuance of a permit to the applicant constitutes an exceptional hardship." Hous., Tex., Code of Ordinances § 19-20(a). The ordinance does not prohibit the granting of a variance based on financial hardship. The ordinance asks an applicant to describe the "estimated cost in dollars of complying with the requirement," and the "estimated cost in dollars of construction by the proposed alternative." *See id.* § 19-20(b)(5)(6). Thus, financial

---

[3] *See Hallco Tex. Inc. v. McMullen Cty.*, 221 S.W.3d 50, 60 (Tex. 2006) (plurality op.).

considerations of the landowner are factors that the City may consider. The Commons' reliance on cases addressing what is an "unnecessary" hardship to avoid zoning regulations are inapplicable. *See Bd. of Adjustments of City of Piney Point Vill. v. Solar*, 171 S.W.3d 251, 255 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *see also* Tex. Loc. Gov't Code § 211.009(a)(3).

The Commons suggests that it cannot comply with the requirements of applying for a floodplain development permit because such applications require The Commons to show the "proposed structures . . . drawn to scale." *See* Hous., Tex., Code of Ordinances § 19-18(a)(2). The Commons contends that the nature of its business—development rather than building—means any application for a permit would be "purely hypothetical."

Nothing prevents The Commons from seeking—and the City from granting—a variance notwithstanding The Commons' failure to show on the application residential buildings drawn to scale. The Commons would not need to submit detailed plans for structures, i.e., residential buildings, if The Commons does not intend to build them. *See Mayhew*, 964 S.W.2d at 932 (holding that a taking claim was ripe after it was clear the municipality would not approve development at the level requested by the landowner; reasoning that a landowner is not required to seek permits that the landowner does not deem economically viable, nor is a landowner required to expend time and resources pursuing a development proposal that the landowner will "never actually develop").

The purpose of the "final decision" requirement, usually evidenced through the denial of a permit, is to determine the "application of the regulations to the property at issue." *Id.* at 929. The Commons' application must be sufficient for the City to make the determination of whether the regulations will bar residential construction below two feet above the 500-year flood elevation. The Commons

10

need only follow "reasonable and necessary" steps to allow the City to exercise its discretion. *See Palazzolo*, 533 U.S. at 620–21. If the City were to unreasonably withhold a final decision from The Commons regarding minimum elevation, the claim could ripen because subsequent applications or variance requests might be futile. *See Mayhew*, 964 S.W.2d at 932; *see also Palazzolo*, 533 U.S. at 621 ("Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.").

Based on this record, however, the futility exception does not apply. The permissible uses of The Commons' property is not known to a reasonable degree of certainty. The Commons must give the City an opportunity to exercise its discretion. *See Palazzolo*, 533 U.S. at 620. Because The Commons has not yet done so, the inverse condemnation claim is not ripe.

### E.     Unripe Chapter 245 Claim

Similar concerns compel a holding that The Commons' request for a declaratory judgment under Chapter 245 is unripe. The Commons contends, however, that the email exchange with one of the City's engineers shows that the City has finally decided that Chapter 245 is inapplicable. We disagree with The Commons.

The email exchange is not the type of "official action" contemplated in the *Village of Tiki Island* cases. *Compare Tiki Island I*, 464 S.W.3d at 442 (holding that the Chapter 245 claim was not ripe because the landowner failed to demonstrate that an official action of the municipality caused injuries when the record failed to show why the municipality denied an earlier plat application; the landowner did not request certified reasons for the denial; no plat or permit applications had since been denied for any specified reasons; and the landowner had not challenged the denial of the plat application in any proceeding), *with Vill.*

*of Tiki Island v. Premier Tierra Holdings, Inc. (Tiki Island II)*, 555 S.W.3d 738, 749 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that the claim was ripe when the municipality denied the landowner's plat applications three times based on substantially the same reasons, and the record showed that the parties engaged in extensive negotiations and that the municipality had multiple opportunities to determine the existence and extent of the landowner's vested rights).

In the email, The Commons asked a general question about unspecified tracts of land without providing any details about the prior plan, plat, or permit applications that had been filed for The Crossing. The City's employee clarified that she was "not an attorney" and gave a general answer. She offered to follow-up and get more information if the answer did not help. But The Commons did not respond with a request for more information or make any specific request to have Chapter 245 applied to The Crossing. We conclude that the email exchange is no evidence that the City has made a final decision to apply the new ordinance to The Commons' property. *See Tiki Island I*, 464 S.W.3d at 442; *Save Our Springs Alliance*, 149 S.W.3d at 683–84. Under these circumstances, the Chapter 245 claim is not ripe.[4]

---

[4] We need not reach the question of whether a claim for a declaratory judgment under Chapter 245 is *only* ripe if a permit application has been denied. *Compare City of Glenn Heights v. Sheffield Dev. Co.*, 55 S.W.3d 158, 166 (Tex. App.—Dallas 2001, pet. denied) ("It is clear from the correspondence in the record that a controversy existed over which ordinance should apply to the development of the subject property, and there is no indication chapter 245 requires a plat application formally be denied before a court can determine the parties' zoning rights."), *with Save Our Springs All.*, 149 S.W.3d at 683–84 (disagreeing with *Sheffield*; "The individual and particular nature of this statutory scheme requires that individual permits be issued or denied for a controversy to be ripe for adjudication."). That is, we do not hold in this case that the sole method of ripening a claim under Chapter 245 is to have a permit denied. The Commons has neither had a permit denied nor obtained any other official decision from the City regarding the application of Chapter 245 to The Crossing. Thus, under the particular facts of this case, the City has not had any opportunity to determine the existence or extent of The Commons' vested rights.

## IV. CONCLUSION

Considering the pleadings and undisputed facts, we hold that The Commons' claims are not ripe. Thus, the trial court erred by denying the City's plea to the jurisdiction. We sustain the City's issue, reverse the trial court's order, and render a judgment that The Commons' claims are dismissed without prejudice. *See Tiki Island I*, 464 S.W.3d at 243–44.

/s/      Ken Wise
          Justice

Panel consists of Chief Justice Frost and Justices Wise and Hassan.

---

*Cf. Tiki Island II*, 555 S.W.3d at 749 (ripe claim when the municipality had the opportunity to determine the existence and extent of the landowner's vested rights).